UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

PETRIKA WADE,

                              Plaintiff,          12-CV-1126(MAT)

             v.                                   **DECISION**
                                                  **and ORDER**
CAROLYN W. COLVIN, Commissioner
of Social Security,[1]

                      Defendant.

_____

## INTRODUCTION

     Petrika Wade, ("Plaintiff"), who is represented by counsel,
brings this action pursuant to the Social Security Act ("the Act"),
seeking review of the final decision of the Commissioner of Social
Security ("the Commissioner") denying her application for
Supplemental Security Income ("SSI"). This Court has jurisdiction
over the matter pursuant to 42 U.S.C. § 1383(c)(3). Presently
before the Court are the parties' motions for judgment on the
pleadings pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure. Dkt. ##10, 11.

## BACKGROUND

     Plaintiff protectively filed an application for SSI June 12,
2009, alleging disability beginning April 13, 2008 due to human
immunodeficiency virus ("HIV"), rheumatoid arthritis, multiple
joint pain, chronic interstitial cystitis, endometriosis,

_____

[1]

  Carolyn M. Colvin is automatically substituted for the previously named
Defendant Michael Astrue pursuant to Fed.R.Civ.P. 5(d). The Clerk of the
Court is requested to amend the caption accordingly.

depression, anxiety, and schizophrenia. T. 136-38, 155. Her initial application was denied, and a video hearing followed before Administrative Law Judge ("ALJ") Stanley Chin on March 1, 2011. T. 9-28, 68-69. Plaintiff, who appeared with counsel, testified at the hearing, as did vocational expert Estelle Davis. T. 9-28, 123-25.

In applying the familiar five-step sequential analysis, as contained in the administrative regulations promulgated by the Social Security Administration ("SSA"), see 20 C.F.R. §§ 404.1520, 416.920; Lynch v. Astrue, No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps), the ALJ found: (1) Plaintiff did not engage in substantial gainful activity since June 12, 2009; (2) she had the severe impairments of HIV, rheumatoid arthritis, depression, anxiety, and schizophrenia; (3) his impairments did not meet or equal the Listings set forth at 20 C.F.R. 404, Subpt. P, Appx. 1, and that she retained the residual functional capacity ("RFC") to perform medium work while avoiding exposure to cold, heat, wetness, humidity, and excessive noise, and limited to simple routine and repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions and routine work changes, and occasional interaction with the public; (4) Plaintiff could not perform any past relevant work; and (5) there was other work that existed in significant numbers in the national economy that Plaintiff could perform. T. 41-47.

2

The ALJ's determination that Plaintiff was not disabled under the Act was issued on March 16, 2011, and became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on September 25, 2012. T. 1-3. This action followed. Dkt.#1.

The Commissioner now moves for judgment on the pleadings asserting that the ALJ's decision was supported by substantial evidence and was based upon the application of correct legal standards. Comm'r Mem. (Dkt.#10-1) 22-29. Plaintiff has filed a cross-motion alleging that the ALJ's residual functional capacity analysis was flawed, the credibility assessment was not supported by substantial evidence, and the vocational expert testimony could not provide substantial evidence to support the ALJ's finding of no disability. Pl. Mem. (Dkt. #11-1) 8-18.

## DISCUSSION

### I.   Scope of Review

A federal court should set aside an ALJ decision to deny disability benefits only where it is based on legal error or is not supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted).

## II.  **Relevant Medical Evidence**

### A.  **Treating Sources**

Plaintiff received medical treatment at Evergreen Health Services ("Evergreen") from October, 2006 through February, 2011. T. 222-300, 515-62, 673-714.

Initially she presented with HIV, insomnia, and reported a history of schizophrenia and moderate asthma. T. 222-23. Medications were Albuterol, Flovent, Valtrex, Prednisone, and Meloxicam. T. 224. Plaintiff was assessed with HIV, insomnia, and schizophrenia in remission. T. 224-25. At that time Plaintiff's CD4 cell count was 729 and viral load was 2970.[2] T. 243.

Plaintiff began outpatient mental health treatment at Horizon Corporation ("Horizon") in 2008. T. 300-32. In July, 2008, she reported using marijuana, powder cocaine, and alcohol in the past 3 months. T. 439. She had recently been placed in jail, prompting the involvement of Child Protective Services. Id.

Plaintiff reported continued insomnia and increased anxiety with racing thoughts in October, 2008. T. 286, 296. Plaintiff was

---

[2] The extent of immune suppression correlates with the level of the CD4 count. Generally, when the CD4 count is below 200, the susceptibility to opportunistic infection is greatly increased. See 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 14.00(F)(2). Viral load tests quantify the amount of HIV present. Id., § 14.00(F)(1)(a)(ii). A viral load of below 10,000 is low for HIV patients not on treatment, and below 50 is undetectable. See The basics CD4 and viral load, available at www.aidsmap.com/.../file/.../CD4_and_viral_load_pdf.pdf (last accessed July 8, 2015). A higher CD4 count and lower viral load are generally desirable.

assessed with HIV and insomnia, and was prescribed Ambien. T. 289. During this time her CD4 was 484 and viral load was 853 without antiretroviral  therapy ("ARV"). T. 286.

A psychiatric assessment from Horizon dated November 11, 2008, indicated diagnoses of psychotic disorder, NOS; schizophrenia by history; marijuana dependance; cocaine and alcohol abuse; HIV positive; rheumatoid arthritis; asthma; seasonal allergies; and endometriosis. T. 306. Id. Plaintiff was prescribed Abilify and Benadryl. Id. She refused antipsychotic medications, Zyprexa and Risperdal, because of concerns regarding side effects and overdose. Id. The attending doctor noted that Plaintiff "was not taking [Zyprexa] as prescribed so it is unclear whether the side effects that she was experiencing on it were from the Zyprexa or her lengthy history of chemical dependancy." T. 305.

A Horizon Mental Health Comprehensive Assessment from April, 2009, indicated that Plaintiff reported paranoia, she was isolating, had increased sleep and appetite, and was depressed because her children were placed in foster care. T. 392. She also reported past visual hallucinations and hearing voices. Id. Plaintiff was diagnosed with schizophrenia by history; psychotic disorder NOS; and cannabis dependancy, alcohol abuse, and cocaine abuse. Id.

In a Medical Examination for Employability Assessment dated June 2, 2009, Dr. Kristen Ahrens opined that Plaintiff would be moderately limited in understanding and remembering instructions,

carrying out instructions, maintaining attention and concentration, making simple decisions, and functioning in a work setting at a consistent pace. T. 358. Plaintiff would be very limited in interacting appropriately with others and maintaining socially appropriate behavior. Id. She had no limitations in physical functioning or in her ability to maintain standards of personal hygiene and grooming. Id.

In July, 2009, Plaintiff reported depression following a family court appearance during which she relinquished rights to her children. T. 407. She had no intent to harm herself or others. Id. In the following weeks, she appeared nervous and depressed, and reported a recent panic attack. T. 403, 406.

In February, 2010, Plaintiff's CD4 count was 496 and viral load was 629. T. 679. Psychologically, she was negative for anxiety, depression, and sleep disturbance; and her affect, demeanor, and thought functions were normal. T. 676-77. She reported that she previously had good pain relief from Mobic, but more recently had to take two per day for partial relief. T. 679.

At a follow-up appointment at Horizon on March 31, 2010, Plaintiff reported experiencing "terrifying nightmares." T. 650. She denied suicidal thoughts, hallucinations, and substance abuse. Id. Her viral load had decreased and CD4 count has increased. Id.

In May, 2010, Plaintiff was stable, seeing a mental health counselor, and her psychiatric findings were negative. T. 679-81.

6

An annual examination at Evergreen dated August 3, 2010, revealed that Plaintiff's joint pain was stable on Mobic, and she had no imaging done and was not currently in pain. T. 687. Her mental health status was stable, and her remaining examination results were unremarkable except for a finding of moderate obesity. T. 690. Her residual schizophrenic disorder was assessed as in remission. Id.

X-rays of Plaintiff's lumbosacral spine taken September 23, 2010, showed no acute bony fracture, dislocation, or focal significant pathologic sclerosis or lysis. T. 727.

Evergreen treatment notes dated October 5, 2010, indicated that Plaintiff complained of rash and low back pain. T. 692. Her physical and psychiatric evaluations were normal, except for moderate obesity. T. 695. She was prescribed medication for hypertension and laboratory work was ordered. Id. The following month, Plaintiff's CD4 count was 512 and viral load was 206 without ARV. T. 696. The Nurse Practitioner noted that Plaintiff's counts remained stable. Id.

A Horizon Treatment Plan dated December 19, 2010, indicated that Plaintiff had resolved her family and legal problems, and was currently sober. T. 656-57. With regard to her psychosis diagnoses, Plaintiff was to continue to see a doctor to maintain low symptoms. T. 656. Throughout her treatment at Horizon, Plaintiff was assessed

7

a Global Assessment of Functioning ("GAF") between 50 and 55.[3] T. 306-32, 401-67, 629-662.

A follow-up visit at Evergreen on January 6, 2011, revealed no new findings and unremarkable examination results. T. 701-04. She was referred to physical therapy upon complaints of low back pain. T. 704. Her most recent lab results indicated a CD4 count of 461 and viral load of 413.

### B.   Consultative Examinations

Plaintiff underwent a consultative psychiatric evaluation by Thomas Ryan, Ph.D., on October 26, 2009. T. 564-68. She reported difficulty sleeping, irritability, and social withdrawal. T. 564. She told Dr. Ryan that she was depressed because she did not have her children, who were apparently removed to foster care due to neglect. Id. Plaintiff reported anxiety, and stated that she had hallucinated in the past but does not with medication. T. 565. She demonstrated somewhat poor insight and judgment on examination, and the remainder of her mental status examination was unremarkable. T. 566. Dr. Ryan opined that Plaintiff demonstrated no significant limitations with regard to work-related skills, but may have a

---

[3] The GAF Scale is a 100-point metric used to rate overall psychological, social, and occupational functioning on a hypothetical continuum of mental-health illness. See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders ("DSM") 32, 34 (4th ed. text revision 2000). A GAF score of 41 to 50 corresponds with "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)," while a score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34

moderate limitation in her ability to perform complex tasks, make adequate decisions, and relate with others. Her ability to deal with stress was impaired. T. 566-67. Dr. Ryan concluded that Plaintiff's psychiatric problems may interfere to some degree on a daily basis. T. 567. Diagnoses were cannabis abuse, reported in remission, and schizoaffective disorder. Id. Continued counseling was recommended and prognosis was fair with treatment. Id.

Dr. Nikita Dave conducted an internal medicine examination on October 26, 2009. T. 569-73. Plaintiff reported that she had rheumatoid arthritis since she was 21, but had never been prescribed medication except for nonsteroidal anti-inflammatory drugs ("NSAIDS"). T. 569. She was diagnosed as HIV positive three years prior, but did not take ARV medication. Id. Plaintiff was treated for depression and schizophrenia since 2000, and experienced asthmatic symptoms since 1995. Id.

Plaintiff's daily activities included cooking 14-16 times per week, cleaning, shopping, and doing laundry. T. 570. She performed child care and self care, and her hobbies were watching television, reading, and listening to the radio. Id. Her physical examination was normal, except for trace bilateral shin pitting edema and reduced range of motion of the internal hip were noted. T. 572. Diagnoses were schizophrenia and depression; asymptomatic endometriosis; HIV positive not requiring medication; genital herpes on medications; rheumatoid arthritis per claimant; asthma, stable; and chronic tobacco use. T. 573.

Dr. Dave assessed mild to moderate limitations for repetitive gross motor manipulation using hands; mild to moderate limitations for repetitive squatting, crouching, and kneeling; and no limitations from asthma as Plaintiff currently smoked. Id.

State Agency review psychiatrist H. Tzetzo reviewed the medical evidence on November 3, 2009, and assessed that Plaintiff would have mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of deterioration of extended duration. T. 584.

### III. **Non-Medical Evidence**

Plaintiff was 30-years old at the time of her application and had obtained a general education diploma. T. 161, 164, 174. In a Disability Report from July, 2009, Plaintiff reported that she became unable to work on June 1, 2006 due to her symptoms of depression and arthritis, particularly in colder weather. T. 155. It was difficult for her to grab/hold objects, her legs and hips cramped up, and she had dizziness and difficulty concentrating. Id.

With regard to her asthma, Plaintiff's symptoms were triggered by dust, extreme cold, and seasonal changes. T. 170. She took medication and used an inhaler and nebulizer occasionally, and had not been hospitalized for asthma symptoms within the past 12 months. Id.

At her disability hearing, Plaintiff testified that she last worked in the food department of a convenience store in April of

2008. T. 13-14. She admitted to past drug use, including marijuana in the previous month. T. 14. She lived with her fiancé and his son in a house, along with a dog and cat. She stated that she only got out of bed to go to appointments or to get up to use the bathroom. T. 16. About three days per week Plaintiff shopped, cooked, cleaned, and helped care for the pets. T. 15-16.

Plaintiff alleged panic attacks every time she left the house alone, and that she got nervous around crowds of people other than her family. T. 17, 21. She would sometimes start crying while watching television. T. 18.

With regard to her back pain, Plaintiff told the ALJ that she was going to physical therapy, and that she could sit for 2 hours before getting up and for about 4-5 hours total. T. 19. Her medications, which included Seroquel and Zyprexa, made her tired and put her in a "zombie state" so that she could not focus. T. 20. Blood pressure medication required frequent bathroom breaks. Id. She stated that her psychiatric symptoms improved since she stopped using drugs and alcohol on a regular basis. Id.

Vocational expert Estelle Davis testified that Plaintiff's past jobs ranged from skilled to unskilled, and were performed at the light exertional level. There were no transferrable skills from any of Plaintiff's past jobs. T. 23-24. The ALJ posed a hypothetical to Ms. Davis regarding an individual of Plaintiff's age, with the same educational and work experience that could lift 50 pounds occasionally and 25 pounds frequently, and could

stand/walk/sit for 6 hours in an 8-hour work day with normal breaks. The individual would be further limited in avoiding concentrated exposure to cold, extreme heat, wetness, humidity, and excessive noise; with only moderate exposure to moving machinery or unprotected heights; and could perform simple, routine, repetitive tasks in a work environment free of fast-paced production requirements and involving only simple work-related decisions and routine workplace changes and occasional interaction with the public. T. 23.

Ms. Davis responded that such an individual could perform Plaintiff's past job as a hotel cleaner, as well as the jobs of assembly, packer sorter, and hand packager. T. 25. Such an individual could not maintain employment if she would be off-task for 20% of the day. T. 26-27.

## IV.   **The decision of the Commissioner was supported by substantial evidence.**

### A.   **Residual Functional Capacity Analysis**

Plaintiff first contends that the ALJ erred in finding Plaintiff capable of medium work with additional mental limitations. Pl. Mem. 8-15; T. 43.

Although the determination of a claimant's RFC is reserved for the Commissioner, see 20 C.F.R. § 416.927(e)(2), an RFC assessment "is a medical determination that must be based on probative medical evidence of record.... Accordingly, an ALJ may not substitute his own judgment for competent medical opinion." Lewis v. Comm'r of

Soc. Sec., No. 00 CV 1225, 2005 WL 1899399, *3 (N.D.N.Y. Aug. 2, 2005) (citing Rosa v. Callahan, 168 F.3d 72, 79; Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (citation omitted)). An ALJ may not "pick and choose" from the medical evidence only those parts that favor a finding of no disability. E.g., Lynch v. Astrue, No. 09-CV-623, 2011 WL 2516213, at *8 (W.D.N.Y. June 21, 2011) (citations omitted).

### 1.  Physical RFC

Plaintiff avers that the ALJ should have found limitations in handling or fingering based on the findings of consultative examiner Dr. Dave, who opined that Plaintiff would have mild to moderate limitations for repetitive gross motor manipulation. Pl. Mem. 9; T. 573.

Here, the ALJ gave Dr. Dave's opinion "little weight" because there was little objective evidence suggesting that Plaintiff had such limitations. T. 46. The Court agrees.

Plaintiff alleged a "small problem" with her left hand due to arthritis. T. 19. The medical records, including Dr. Dave's examination findings, did not establish that Plaintiff's left hand presented a condition resulting in any significant deficits in handling or fingering. Although a nodule was present on the left wrist on May 28, 2008, and Plaintiff was assessed with a bone spur of the left hand in October, 2008, the balance of the record evidence does not support Dr. Dave's opinion. T. 275, 294. Notably, Dr. Dave found that Plaintiff's hand and finger dexterity was

intact, grip strength was 5/5 bilaterally and there was no gross hand, knee, ankle, or foot deformities. T. 572-73. Treatment notes from Evergreen over the course of several years also show that Plaintiff consistently had no radiating pain, numbness, or range of motion limitations; normal range of motion in all muscle groups with no limb or joint pain; and negative findings for arthralgia, joint stiffness, limb pain, and myalgias. T. 224, 226, 255, 258, 526, 534, 572, 690, 694, 699, 703. Her rheumatoid arthritis was treated with NSAID medications, which generally provided good relief. T. 262, 269, 569, 670. Finally, x-rays of the left hand indicated some degenerative changes, but no acute articular abnormalities. T. 208.

The record therefore contained ample medical evidence for the ALJ to assess the extent of Plaintiff's handling and fingering limitations, and there was no reason for the ALJ to re-contact her treating sources on this issue. See 20 C.F.R. §§ 416.912(e), 416.927(e)(2)(iii) (ALJ required to re-contact treating physicians or obtain consultative examinations where the information received is inadequate to determine whether claimant is disabled); Pl. Mem. 10-12.

In a related argument, Plaintiff claims that the ALJ erred in not articulating a function-by-function basis on the issue of Plaintiff's manipulative limitations. Pl. Mem. 10.

In determining a plaintiff's RFC, the ALJ must identify the individual's functional limitations or restrictions and assess his

14

or her work-related abilities on a function-by-function basis, including mental capabilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision. <u>See</u> Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (S.S.A. 1996); 20 C.F.R. §§ 404.1545, 416.945. However, an explicit function-by-function analysis is not required. "Where an ALJ's analysis at step four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous," remand is not necessary. <u>Cichocki v. Astrue</u>, 729 F.3d 172, 177 (2d Cir. 2013) ("The relevant inquiry is whether the ALJ applied the correct legal standards and whether the ALJ's determination is supported by substantial evidence."). Such is the case here, where the ALJ's residual functional capacity assessment with associated limitations was consistent with the Plaintiff's extensive medical records, diagnostic imaging tests, activities of daily living, and her own testimony regarding her symptoms.

### 2.  Mental RFC

Plaintiff also challenges the ALJ's mental RFC finding, relying upon the medical source statement by her treating psychiatrist at Horizon.  Pl. Mem. 12.

Treating source Dr. Ahrens opined that Plaintiff was "very limited" in 3 of 8 functional areas, and "moderately limited" in 5.

T. 358. The ALJ accorded little weight to Dr. Ahrens' opinion that Plaintiff was very limited in her ability to interact with others and to maintain socially appropriate behavior without exhibiting behavior extremes. T. 46. Finding, however, that Plaintiff did have moderate limitations in interacting appropriately with others and maintaining socially appropriate behaviors, he factored these limitations in to the residual functional capacity analysis, ultimately determining that Plaintiff would be limited to simple, routine, and repetitive tasks in an environment free of fast-paced production requirements, and involving only simple work-related decisions and routine work pace changes with occasional interaction with the public. T. 43. He therefore incorporated the portion of Dr. Ahrens' assessment that was supported by the record into his RFC determination.

Treatment notes show that Plaintiff's mental health status was routinely stable and that her schizophrenic disorder was both residual and in remission. T. 267, 300-32. Plaintiff appeared "quite functional" in August, 2008; denied all psychoses and depression in December, 2008; stated that she felt stable on Abilify and able to handle her current financial stresses in April of 2009; and reported "overall feeling well" in July, 2009. T. 300-32, 406-09. In August, 2009, Plaintiff was sober, compliant with medication, and demonstrated better insight and judgment. T. 635. Although she was "sad" and "quiet" at her follow-up appointments due to losing custody of her children, she did not

demonstrate overt psychosis and was not suicidal, and remained drug-free. T. 638, 641. In November, she reported feeling "good," with more motivation and energy, and no depression. T. 644.

The record overall thus indicates that upon examination, Plaintiff's affect and demeanor were appropriate, psychomotor function, speech pattern, thought, and perception were normal. T. 275, 538, 541, 547, 676-77, 690. Despite Plaintiff's family and legal stressors and related depression, she denied suicidal thoughts, crying spells, mood swings, sadness, and sleep disturbance. T. 277, 519, 526, 632.

Because Dr. Ahrens' restrictive opinion was contradicted by the majority of the medical record, any challenge Plaintiff brings pursuant to the "treating physician rule" must also fail. See generally 20 C.F.R. §§ 416.927(c)(2), 404.1527(c)(2) (treating physician's opinion is entitled to controlling weight where it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."); see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("the less consistent [the treating source opinion] is with the record as a whole, the less weight it will be given.")

For all of these reasons, the Court finds that the ALJ properly considered the evidence and provided an adequate explanation for his residual functional capacity determination. His

decision was therefore supported by substantial evidence in the record.

**B.   Credibility Assessment**

Next, Plaintiff alleges that the ALJ did not apply the appropriate standards set forth in SSR 96-7p and 20 C.F.R. § 404.1529 in assessing Plaintiff's credibility. Pl. Mem. 15-18.

To establish disability, there must be more than subjective complaints. There must be an underlying physical or mental impairment, demonstrable by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 416.929(b); accord Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983). When a medically determinable impairment exists, objective medical evidence must be considered in determining whether disability exists, whenever such evidence is available. 20 C.F.R. § 416.929(c)(2). If the claimant's symptoms suggest a greater restriction of function than can be demonstrated by objective medical evidence alone, consideration is given to such factors as the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness, and adverse side-effects of medication; and any treatment or other measures used to relieve pain. 20 C.F.R. § 416.929(c)(3); see SSR 96-7p, (July 2, 1996), 1996 WL 374186, at *7. It is well within the Commissioner's discretion to evaluate the credibility of Plaintiff's testimony and

render an independent judgment in light of the medical findings and other evidence regarding the true extent of symptomatology. Mimms v. Sec'y, 750 F.2d 180, 186 (2d Cir. 1984); Gernavage v. Shalala, 882 F.Supp. 1413, 1419 (S.D.N.Y. 1995).

"If the ALJ decides to reject subjective testimony concerning pain and other symptoms, he must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." Brandon v. Bowen, 666 F.Supp. 604, 608 (S.D.N.Y. 1987) (citing, inter alia, Valente v. Sec'y, 733 F.2d 1037, 1045 (2d Cir. 1984); footnote omitted).

Here, the ALJ found that Plaintiff's subjective complaints were inconsistent with the previously-determined residual functional capacity assessment. T. 45. Despite using the frowned-upon boilerplate language in his decision, the ALJ's credibility determination was nonetheless supported by substantial evidence.

Following the credibility determination, the ALJ discussed each of Plaintiff's impairments and their effects on her ability to work. T. 45. Among other things, the ALJ noted that Plaintiff's HIV was controlled;[4] her back pain was unsupported by diagnostic

---

[4] The ALJ erroneously noted that Plaintiff's HIV was "well controlled by medication." In fact, Plaintiff's lab results throughout the course of her treatment at Evergreen indicated that her CD4 and viral load were stable without ARV medication.

imaging tests and physical examinations; her rheumatoid arthritis, though a severe impairment, found little support in the record, including x-rays of the hands; and, with regard to her asthma, the majority of the chest x-rays were unremarkable and Plaintiff continued to smoke. Id. The mental objective medical record also undermined Plaintiff's claims of disabling mental impairments. Id. She testified that her substance abuse was in remission, and the treatment notes indicated that her residual schizophrenia was controlled by medication. Id. Finally, the ALJ noted that these impairments had little impact on Plaintiff's activities of daily living. Id.

The ALJ considered the medical evidence, Plaintiff's statements concerning her symptoms and alleged functional limitations, and her activities of daily living in assessing her credibility. Accordingly, the credibility determination here was proper. See Diakogianis v. Astrue, 975 F.Supp.2d 299, 318-19 (W.D.N.Y. 2013) (determining the ALJ's credibility assessment was supported by substantial evidence where the ALJ assessed the plaintiff's subjective complaints "in the context of a comprehensive review of the entire medical record," despite the use of the boilerplate language that the plaintiff's complaints were "inconsistent with the above residual functional capacity"); Luther v. Colvin, No. 12-CV-6466, 2013 WL 3816540, at *7-8 (W.D.N.Y. July 22, 2013) (finding ALJ properly assessed plaintiff's credibility despite boilerplate language in opinion that

plaintiff's alleged symptoms were "inconsistent with the above residual functional capacity"); <u>Abdulsalam v. Comm'r</u>, No. 12-CV-1632, 2014 WL 420465, at *7 (N.D.N.Y. Feb. 4, 2014) ("this erroneous boilerplate language does not merit remand if the ALJ offers specific reasons to disbelieve the claimant's testimony") (internal quotation omitted).

The Court finds that the ALJ's credibility determination was proper as a matter of law and supported by substantial evidence in the record.

### C.   Vocational Expert Testimony

Plaintiff avers that because the ALJ's residual functional capacity analysis was flawed, the hypothetical posed to the vocational expert was incomplete and therefore was not supported by substantial evidence. Pl. Mem. 18-19.

The Court has rejected all of Plaintiff's previous arguments and finds that the ALJ's residual functional capacity finding was supported by substantial evidence. Having reached this determination, the Court finds no error in the ALJ's step five conclusion. <u>See</u> <u>Wavercak v. Astrue</u>, 420 Fed.Appx. 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge").

### <u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt.#10) is granted, and Plaintiff's

cross-motion (Dkt.#11) is denied, and the complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.


S/Michael A. Telesca
_____
MICHAEL A. TELESCA
United States District Judge

Dated:    Rochester, New York
          July 9, 2015